UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES MARVIN,

        Petitioner,

v.

DEPARTMENT OF CORRECTIONS AND REHABILITATION and ANTHONY KANE, Warden,

        Respondents.

No. C 06-04958 MHP

**MEMORANDUM & ORDER**
**Re: Petition for Writ of Habeas Corpus**

Petitioner James Marvin, a California prisoner currently incarcerated at the Correctional Training Facility in Soledad, California, petitions for a writ of habeas corpus pursuant to 28 U.S.C. section 2254. Marvin asks that this court direct respondents to: (1) dismiss the prison disciplinary board's decision finding him guilty of a disciplinary violation, as well as any reference to the same; and (2) expunge the associated disciplinary charges. His petition is now before the court for review pursuant to 28 U.S.C. section 2243 and Rule 4 of the Rules Governing Section 2254 Cases.

BACKGROUND[1]

Marvin, currently serving an indeterminate life sentence for first degree murder, is challenging a prison disciplinary board decision which found he violated California Code of Regulations ("CCR") section 3005(a) by attempting to undermine the Catholic Chapel Program ("CCP") at the California Men's Colony where he was incarcerated.

Marvin, along with several other inmates—David Dutra, Steven Murphy, Benny Ros, and Gerald Shil ("alleged co-conspirators")[2]—were long-term participants in the CCP under the direction of Father Alphonse Van Guilder. Father Alphonse retired in January 1999. Twenty-two months later, in November 2000, Father R. Francis Stevenson was hired as the Catholic Chaplain for the CCP. Marvin had been active in the CCP for eight years as a Prefect, Special Minister of the Eucharist, choir member, server for special events and volunteer. Nevertheless, soon after Father Stevenson's arrival, in early 2001, Marvin quit the CCP.

While volunteering with the CCP, Marvin and the alleged co-conspirators enjoyed considerable freedom at the chapel office, where they were unsupervised during the approximately twenty-two month period prior to the arrival of Father Stevenson. See Ans. at 2. Marvin and the alleged co-conspirators controlled the flow of paperwork in the chapel office, which permitted them to control which inmates were able to have outside visitors attend family services. Id. Some of the alleged co-conspirators also used the chapel bathroom for trysts with their wives and stole food from the family service banquets to sell on the yard. Id.

After his arrival, Father Stevenson prohibited Marvin and the alleged co-conspirators from using the chapel office without supervision. Id. In response, Marvin and the alleged co-conspirators became angry and began to agitate other inmates in an effort to decrease participation in the CCP. Id. at 2–3. They also began making threatening statements. Id. This behavior persisted over a period of months, during which time Marvin and the alleged co-conspirators discouraged participation in the CCP in a coordinated effort to have Father Stevenson removed. Ans., Exh. G at 7. Matters reached a critical point when fellow inmates began to feel that Marvin and the alleged co-conspirators had "crossed the line" by promising to "take [Father Stevenson] down." Id.

Marvin contends that Father Stevenson altered the style of the CCP "from a conventional style that conformed to Catholic tradition and belief to an unorthodox, militaristic program . . . contrary to Catholic dictates and tradition." Pet. at 4. Marvin states that his decision to withdraw from the program was an individualized one made on the basis of personal beliefs and feelings about the program. Specifically, he quit due to the changes made by Father Stevenson. The alleged co-

conspirators also withdrew from the program during the same period. Marvin states that he "did not conspire, agree, or even consult with" the other inmates in their individualized decisions to dissociate themselves with Father Stevenson and the CCP. Id. at 5. To this end, he argues that over 100 other inmates also withdrew from the program during Father Stevenson's tenure. A little over two years after his arrival, in February 2003, Father Stevenson was transferred to another prison.

On January 2, 2002 Marvin and the alleged co-conspirators were placed in administrative segregation and charged with disciplinary violations. They were charged with conspiring to: (1) dissuade the free participation of the other inmates in the Catholic religious program; (2) make statements of a threatening nature against Father Stevenson; and (3) negatively affect the employment of Father Stevenson. Resp's Exhibits, Exh. B at 1.[3]

Marvin was assigned an investigative employee ("IE") who interviewed inmates Miller, Rayburn, Clifton, Wolff and Bravo. Id. at 2. Prior to his hearing, Marvin was notified that confidential material was being considered and he was given a summary of the confidential information. Id. at 1. This material was compiled in a written report based on an internal investigation conducted by Lieutenant Wiley ("Wiley Report"). Ans. at 2–3. It was based in part on Wiley's interviews with staff and inmates. Id. at 2. In his report, Wiley concluded that Marvin had joined a conspiracy to undermine attendance at the Catholic Chapel service. Id. The report also found that Marvin and the alleged co-conspirators had threatened Father Stevenson. Id. The Wiley Report was kept confidential during the disciplinary proceeding because it was determined that the information, if known to Marvin, would jeopardize the safety of the informants. Resp's Exhibits, Exh. B at 1.

On February 16, 2002 Marvin received a prison disciplinary hearing. Id. at 1. At the hearing, Marvin acknowledged that he had received copies of the charges and all pertinent documents at least twenty-four hours prior to the hearing. Id. Marvin did not request any additional materials at the hearing nor did he choose to call any staff or inmate witnesses. Id. at 2. At the outset, the Senior Hearing Officer advised Marvin that confidential information would be considered, that the identity of the confidential inmate sources would not be divulged and that the

confidential information provided had been scrutinized and was determined to be reliable under CCR section 3321(c). Id. at 1. The purpose of the hearing was explained and the Rules Violation Report was read aloud. Id. at 2. Marvin stated that he was in good health and ready to proceed with the hearing. Id. After the hearing, Marvin was found guilty of the disciplinary charge of attempting to undermine the CCP. Ans. at 2. It was his second significant disciplinary violation while incarcerated. Ans., Exh. F at 58.

On June 1, 2004 the Board of Parole Hearings ("the Board") denied Marvin parole. Id. at 63. The Board commended Marvin for obtaining his General Educational Development ("GED") diploma and a Bachelor of Arts in computer science, his excellent work history in computers, and his participation in Narcotics Anonymous and the Anger Management Programs. Id. at 59. In rendering its decision, however, the Board emphasized that the commitment offense had been "carried out in an especially violent and brutal manner." Id. at 60. The Board noted that Marvin's offense amounted to "an execution-style murder" that was carried out in a "dispassionate and calculated manner." Id. at 57.[4] Discussing Marvin's rehabilitation, the Board took account of the disciplinary violation that is the subject of this petition. Id. at 60. Considering the totality of the circumstances, the Board determined that "a longer period of observation [was] required before the Board should find that [Marvin] is suitable for parole." Id. at 60–61.

Marvin sought relief in the California courts regarding his disciplinary violation. The San Luis Obispo County Superior Court denied his petition for a writ of habeas corpus on January 14, 2004 in a reasoned order. Ans., Exh. G at 8. The California Court of Appeal summarily denied his petition for a writ of habeas corpus and the California Supreme Court summarily denied his petition for review. Marvin then filed this federal petition for a writ of habeas corpus. Respondent answered and petitioner filed a traverse. The matter is now ready for a decision on the merits.

The issue presented is whether Marvin was denied due process when the prison disciplinary board found him guilty of attempting to undermine the CCP. Marvin asserts that the disciplinary board's actions amounted to such a violation because they failed to disclose the confidential Wiley Report and because the evidence relied upon did not meet the "some evidence" standard.

4

## JURISDICTION AND VENUE

A petition for a writ of habeas corpus made by a person in custody under the judgment and sentence of a state court of a state which contains two or more federal judicial districts may be filed in either the district of confinement or the district of conviction. See 28 U.S.C. § 2241(d). Each of such districts shall have concurrent jurisdiction to entertain the petition; however, the district court for the district where the petition is filed may transfer the petition to the other district in the furtherance of justice. See id. Venue lies in this district because Dutra is incarcerated in the Correctional Training Facility in Soledad, California, which is in the Northern District of California.

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in this petition.

## LEGAL STANDARD

This court is required to analyze state habeas corpus claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that this court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Specifically, 28 U.S.C. section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126–27 (9th Cir. 2006). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim resulted in a decision that was: (1) "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court has interpreted AEDPA to require a district court to uphold the state court's decision unless that decision was an objectively unreasonable application of a clearly established federal law. Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Accordingly, this court will review the last reasoned state court opinion under the standards outlined in AEDPA. See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006). Here, the last reasoned state court opinion occurred in the California Superior Court for the County of San Luis Obispo ("Superior Court"). This court will apply the AEDPA standard to the Superior Court proceeding to determine whether it was an "objectively unreasonable" denial of parole.

DISCUSSION

Before the Superior Court, Marvin asserted multiple claims in support of his petition for a writ of habeas corpus. The Superior Court, however, considered only three of Marvin's claims, stating that "[s]ince these were the only bases on which [Marvin] exhausted [his] administrative remedies, these are the only bases [he] may pursue on habeas corpus." Ans., Exh. K at 4. This court agrees. Marvin now asserts only two of those claims.[5] Specifically, the court will address Marvin's claims that his right to due process was violated because: (1) the Senior Hearing Officer failed to disclose the confidential Wiley Report; and (2) there was insufficient evidence to support the committee's decision.

Pursuant to AEDPA, the issues presented are whether the state court's decision was either: (1) contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). The court considers each argument in turn.

I.    <u>Contrary to or an Unreasonable Application of Clearly Established Federal Law</u>

A state court's denial of an application for a writ of habeas corpus is "contrary to" federal law when it "applies a rule that contradicts the governing law set forth in [U.S. Supreme Court] cases" *or* "confronts a set of facts that are materially indistinguishable from a decision of [the U.S. Supreme Court] and nevertheless arrives at a [different result]." <u>Lockyer</u>, 538 U.S. at 73 (citations and internal quotations omitted). On the other hand, a state court's finding is an "unreasonable application" of federal law when it "identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 75 (internal citation and quotations omitted). "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." <u>Id.</u> (citations and internal quotations omitted). Instead, a reversal of the state court's determination of a legal question is only appropriate where the state court's application is found to be objectively unreasonable. <u>Id.</u> at 76.

Before the Superior Court, Marvin argued that his disciplinary violation should be expunged and the charges dismissed because the Senior Hearing Officer's decision was based on the testimony of unreliable confidential informants. Addressing Marvin's reliability argument, the state court cited the Supreme Court's opinion in <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974) for the proposition that "punishment of an inmate based on information that is not completely disclosed may occur in prisons." Ans., Exh. G at 5. In <u>Wolff</u>, the Court established a set of procedural safeguards designed to ensure that prison officials comply with the mandates of due process when conducting prison disciplinary hearings. 418 U.S. at 564–70. One such safeguard was the provision that "there must be a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action." <u>Id.</u> at 564 (citation and internal quotations omitted). Yet, the <u>Wolff</u> Court also warned that "there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence . . . ." <u>Id.</u> In those circumstances, the Court required that the factfinder's written statement "should indicate the fact of the omission." <u>Id.</u>

7

Here, the Superior Court's decision was not contrary to clearly established federal law. First, the record contains no indication, and Marvin has not suggested, that the Superior Court reached a different result than the U.S. Supreme Court did when facing materially indistinguishable facts. Lockyer, 538 U.S. at 73. Second, the Superior Court did not apply Wolff so as to "contradict[] the governing law set forth in [U.S. Supreme Court] cases." Id. Indeed, the Superior Court's decision was entirely consistent with the Supreme Court's holding in Wolff because the Senior Hearing Officer's written statement complied with Wolff's mandates. The Senior Hearing Officer produced a written statement summarizing the evidence relied upon, including the Rules Violation Report dated January 28, 2002 and the Wiley Report dated January 23, 2002. Resp's Exhibits, Exh. B at 2. The written statement also explained that the Wiley Report met the requirements for confidentiality because the information, if known to the inmate, "would endanger the safety of [the confidential informants] and would jeopardize the security of the institution." Id. The written statement further complied with Wolff's requirement that omissions be stated within the report by noting that the evidence relied on included "the confidential memorandum, written and submitted by Lieutenant M.H. Wiley . . . ." Id. The Superior Court applied federal law faithfully and correctly cited Wolff to establish that prison officials are, in appropriate circumstances, permitted to punish an inmate "based on information that is not completely disclosed . . . ." Ans., Exh. G at 5. Accordingly, the Superior Court's decision was not contrary to clearly established federal law.

The Superior Court's decision also did not involve an unreasonable application of federal law. As an initial matter, the state court primarily relied on California law, and did not specifically apply Wolff, when determining that the informant's statements were reliable. The state court cited Wolff to establish that the mere usage of confidential information in a prison disciplinary hearing is not a violation of due process. See Ans., Exh. 10 at 5. Nevertheless, the Superior Court did not err in the manner described in Lockyer by "identif[ying] the correct governing legal principle . . . but unreasonably appl[ying] that principle to the facts of the prisoner's case." 538 U.S. at 75. In Wolff, the Supreme Court expressly provided that confidential information may be withheld from the committee's written statement where institutional or personal safety is implicated, so long as the fact

of the omission is noted in the written statement. 418 U.S. at 565. The Senior Hearing Officer's report clearly noted the omission of the confidential report due to safety concerns. Exhibits, Exh. B at 2. The question, therefore, is whether the Superior Court unreasonably determined that institutional or personal safety was implicated by the confidential information in the Wiley Report.

Based on an *in camera* review of the Wiley Report and, in consideration of the Superior Court's analysis, this court cannot conclude that the state court's application was objectively unreasonable. Petitioner Marvin was convicted of murdering his victim by luring him to a secluded location, firing an arrow into his back execution-style, and leaving his body abused and mutilated. Ans., Exh. F at 57–58. While in custody, Marvin's behavior, while commendable in many regards, became erratic after Father Stevenson's arrival. After being denied unsupervised access to the chapel office, Marvin abruptly ended his eight year association with the CCP. Pet. at 4. For a substantial period of time thereafter, Murphy and the alleged co-conspirators made threatening remarks about Father Stevenson and discouraged other inmates from participating in the CCP. Ans. at 2. Based on Marvin's violent history and erratic behavior, the Senior Hearing Officer reasonably determined that Marvin posed a threat to institutional safety and the safety of the unidentified inmate informants. Thus, the Superior Court's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

II. <u>Unreasonable Determination of the Facts</u>

In assessing whether there has been an unreasonable determination of the facts, the court will address the following two issues: (1) whether "some evidence" supports the disciplinary board's determination of the facts; and (2) whether that evidence was reliable.

The Supreme Court's decision in <u>Superintendent v. Hill</u>, 472 U.S. 445, 455–56 (1985), provides that "the requirements of due process are satisfied if some evidence supports the decision by [a] prison disciplinary board." This standard is met so long as there is "some evidence from which the conclusion of the administrative tribunal could be deduced . . . ." <u>Id.</u> at 455 (citations omitted). The "some evidence" standard "does not require examination of the record, independent

assessment of the credibility of witnesses, or weighing of the evidence." Id. This is because "the fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." Id. at 456.

Some evidence supports the Senior Hearing Officer's determination of the facts. In finding Marvin guilty of attempting to undermine the CCP, the Senior Hearing Officer relied on the information contained in the Wiley Report, the IE Report and the Rules Violation Report. Resp's Exhibits, Exh. B at 2. After an *in camera* review of the Wiley Report, the Superior Court found that there was "absolutely no question that there was 'some evidence' that . . . [Marvin and the alleged co-conspirators] attempted to weaken Father Stevenson's control by denouncing his programs and making verbal threats that they would 'take him down.'" Ans., Exh. G at 7. This court agrees. After an *in camera* review of the Wiley Report, this court is satisfied that "some evidence" supports the conclusion reached by the Senior Hearing Officer. Specifically, the Wiley Report contained several firsthand accounts of Marvin's behavior which described how Marvin and the alleged co-conspirators used the chapel as a hangout, denied certain inmates access to the family services program, sold food designated for the family services program on the yard and used the chapel bathroom for trysts with their wives. Ans. at 2. The Wiley Report also relates that Marvin and the alleged co-conspirators made threatening statements, including a promise to "take [Father Stevenson] down" and actively discouraged other inmates from participating in the CCP. Ans., Exh. G at 7. The information in the Rules Violation Report supports these findings.

Moreover, the above cited evidence is reliable. It is well established that "there must be some indicia of reliability of the information that forms the basis for prison disciplinary actions." Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987). A prison disciplinary committee's reliance on the statements of "an unidentified inmate informant satisfies due process when: (1) the record contains some factual information from which the committee can reasonably conclude that the information was reliable, and (2) the record contains a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name." Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir. 1987).

10

First, the record contains sufficient detail to establish the reliability of the confidential informants. Reliability is established by: (1) oath of the investigating officer; (2) corroborating testimony; (3) a statement on the record by the chairman of the committee indicating that he has firsthand knowledge of the sources of the information and that he considered them reliable based on the informant's record; or (4) *in camera* review of the documentation from which informant credibility was determined. Id. at 186–87. Here, the reliability of information provided was established in three distinct ways. First, the three unidentified inmate informants who provided most of the information had proven reliable in the past. Ans. at 9. Second, the information provided by these informants was further corroborated by four other confidential sources who independently provided the same information. Id. Third, part of the information provided by these informants was later corroborated by prison officials in an independent investigation of the matter. Id.

Upon these facts, the Superior Court determined that the informants' information was reliable. To ascertain the reliability of the informant testimony and the nature of the risk, the Superior Court undertook a *sua sponte* review of the Wiley Report to assess "whether the hearing officer reasonably could have determined that the information was reliable, and whether the information, if reliable, [was] sufficient to support the guilty finding." Ans., Exh. G at 6. The Superior Court was persuaded of the veracity of the information documented in the Wiley Report. The court noted that Lieutenant Wiley interviewed seven inmate witnesses and one staff witness in addition to Father Stevenson and the four accused inmates. Id. Lieutenant Wiley, the court noted, memorialized his findings in a fifteen page, single spaced, type written report. Id. Lastly, the court recognized that all eight nonparty witnesses provided some firsthand information. Id. This court is convinced by the Superior Court's rationale finding the Senior Hearing Officer's reliance on the unidentified informants to be reasonable. Accordingly, the first prong of Zimmerlee is met.

To comply with the mandates of due process, however, the prison officials were also required to meet the second prong of Zimmerlee by making an affirmative statement that safety considerations prevented disclosure. The Rules Violation Report explained that the prison's investigation included information from confidential informants. Resp's Exhibits, Exh. B at 1–2.

11

The Report described how the information met "the criteria for reliability per [CCR] Section 3321(c) . . . ." Id. at 2. It explains that the confidential information couldn't be provided to Marvin because to do so would endanger the confidential informants and jeopardize institutional security. Id. The Report was signed by Lieutenant Wiley. Thus, Zimmerlee's second prong is met.

Both prongs of Zimmerlee have been met; the information provided by the undisclosed informants was reliable. Accordingly, having determined that some evidence supports the state court's adjudication of Marvin's petition and that the evidence relied upon satisfies all the requirements of due process, this court is satisfied that the Superior Court's denial of Marvin's petition for a writ of habeas corpus was proper. In sum, Marvin has failed to establish his entitlement to relief under either section 2254(d)(1) or 2254(d)(2).

CONCLUSION

For the foregoing reasons the petition for a writ of habeas corpus is DENIED.

IT IS SO ORDERED.

Dated: January 7, 2008

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

## **ENDNOTES**

1. Unless otherwise noted, all facts are taken from Marvin's petition.

2. For purposes of brevity, the court will refer to the group of inmates encompassing David Dutra, Steven Murphy, Benny Ros, and Gerald Shil as Marvin's "alleged co-conspirators." This usage, however, is not intended to be suggestive of the ultimate legal questions at issue in this petition.

3. Respondents mistakenly attached alleged co-conspirator Steven Murphy's Rule Violation Report as Exhibit B to their answer. Consequently, all citations to Marvin's Rule Violation Report will be to Exhibit B of the Exhibit list submitted in case number CV 06-00323 MHP.

4. The Board expressed concern that the offense demonstrated "a callous disregard for human suffering." Ans., Exh. F at 60. Specifically, the Board noted that petitioner and his four crime partners "lured" the victim to a secluded area of Huntington Beach under the pretext that they were going rabbit hunting. Id. The Board described the abuse and mutilation of the victim's partially nude body, including multiple stab wounds, a crossbow arrow wound through the victim's eye that penetrated the brain and a separate arrow wound to the back that severed his spinal cord. Id. at 58.

5. Marvin asserts that his regulatory and statutory due process protections were abrogated when he was: (1) deprived of his right to present requested witnesses who would have provided exculpatory evidence; (2) deprived of his right to receive copies of crucial non-confidential documents that were to be relied on by the Hearing Officer; (3) deprived of effective assistance of the investigative employee; and (4) not informed of crucial facts explaining the "when, where, and to whom" of the alleged misconduct or what statements or actions constituted it. Pet. at 2. Not all of these claims were exhausted before the state courts. Consequently, like the Superior Court, this court addresses only claims that petitioner has exhausted.